VERTEX SURGICAL, INC., Plaintiff,

v.

PARADIGM BIODEVICES,
INC., Defendant.

Civil Action No. 07–10134–DPW.

United States District Court,
D. Massachusetts.

Jan. 9, 2009.

Barbara H. Kramer, Kramer & Kramer, LLP, Ann Arbor, MI, L. Seth Stadfeld, Weston Patrick Willard & Redding, PA, Boston, MA, Mitchell A. Kramer, Kramer & Kramer LLP, Rydal, PA, for Plaintiff.

Robert R. Pierce, Pierce & Mandell, P.C, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

DOUGLAS P. WOODLOCK, District Judge.

This contract dispute arose from an arrangement to market and sell surgical devices for spine operations. The Defendant, Paradigm Biodevices, Inc. ("Paradigm"), manufactures and distributes surgical devices in the Unites States. In December 2004, Paradigm entered into an agreement with the Plaintiff, Vertex Surgical, Inc. ("Vertex"), pursuant to which Vertex would sell Paradigm's devices to surgeons in Alabama, Georgia and eastern Tennessee. Paradigm notified Vertex in May 2006 that it was terminating the agreement, and thereafter stopped paying commissions, giving rise to this diversity suit under 28 U.S.C. § 1332. The matter is before me on the Plaintiff's Motion for Partial Summary Judgment.

## I. BACKGROUND

Paradigm is a Massachusetts corporation that manufactures and distributes surgical products, including a set of products used in spinal surgeries. Vertex, a Georgia corporation, sells medical equipment as a sales representative. Vertex, which has two employees, engages independent sales representatives to sell products on behalf of Vertex.

On December 14, 2004, Paradigm and Vertex entered into an Independent Agent Agreement ("Agreement"), which appointed Vertex as a sales agent with the exclusive right to sell certain Paradigm medical devices—STALIF and Quickdraw Bone Harvester ("Quickdraw")—in Georgia, Alabama, and eastern Tennessee. STALIF is a mechanical spinal fixation system manufactured by an English company and distributed by Paradigm in the United States. Quickdraw, manufactured by Paradigm, is a disposable bone harvester for spinal fusion procedures. Under the Agreement, Paradigm was to pay Vertex commissions on the sale of STALIF and Quickdraw in Vertex's region. The Agreement had a one-year term, but would renew automatically for additional one-year terms unless either party terminated the arrangement. The Agreement also had an integration clause, stating that the "Agreement contains the entire agreement and understanding between the parties respecting the subject matter hereof, and supersedes all prior and collateral agreements and understandings."

The Agreement provided that sales quotas would be assigned to Vertex "within 60 days of execution & 60 days prior to each subsequent calandar [sic] year." Paradigm sent Vertex its initial sales quota via email on February 4, 2005, within the sixty-day deadline. The email, sent by Paradigm's president Michael O'Neill to Vertex's president Sean Bitting, stated: "Attached is the quota for you [sic] area for the first half of '05." Vertex alleges that no quotas were in place after the first half of 2005. Paradigm contends that quotas were assigned during the course of the contractual relationship, and that Vertex failed to perform its obligations to meet the sales quotas for its territory.

On January 12, 2006, Paradigm delivered a letter to Vertex notifying it that Paradigm was reducing Vertex's territorial responsibilities. The parties dispute whether the letter in fact identified the actual changes to those territorial responsibilities. On May 5, 2006, the parties modified the Agreement through emails;

under this modification, Vertex relinquished part of its sales territory, and Paradigm agreed to pay Vertex sales commissions on its remaining territories until November 5, 2006. Nonetheless, on May 18, 2006, Paradigm notified Vertex by letter that it was terminating their Agreement, effective immediately. Paradigm apparently made no further payments to Vertex after May 18.

Vertex filed this lawsuit asserting three counts: breach of contract (Count I); violation of the Georgia Wholesale Distribution Act (Count II); and violation of the Massachusetts unfair trade practices statute, Mass. Gen. Laws ch. 93A, § 1 *et seq* (Count III). Through the motion currently before me, Vertex moves for summary judgment as to Counts I and II.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "where no genuine issue of material facts exists and the movant is entitled to judgment as a matter of law." *Jasty v. Wright Med. Tech., Inc.,* 528 F.3d 28, 35 (1st Cir. 2008) (citing Fed.R.Civ.P. 56(c)). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir.2004) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The moving party, Vertex, has the burden to demonstrate that the evidence does not support the nonmoving party's case. *Napier v. F/V DEESIE, Inc.,* 454 F.3d 61, 66 (1st Cir.2006). The court must construe the facts "in the light most favorable to the party opposing the motion." *Coffin v. Bowater Inc.,* 501 F.3d 80, 85 (1st Cir.2007).

## III. ANALYSIS

The parties dispute whether there exist genuine issues of material facts, which would preclude this Court from issuing summary judgment on either Count I for breach of contract or Count II for violation of the Georgia Wholesale Distribution Act. I find issues of material fact. More fundamentally, I find that the parties' contractual choice of law provision bars Count II's invocation of the Georgia Wholesale Distribution Act. Consequently, I will deny the motion for partial summary judgment.

### A. Breach of contract

In its Complaint, Vertex identifies three actions by Paradigm that breached the parties' contract: Paradigm withdrew part of Vertex's designated territory in January 2006; Paradigm improperly terminated the Agreement in May 2006; and Paradigm failed to pay the commissions due to Vertex under the Agreement. Vertex argues that the parties have no genuine material disputes regarding these actions, but instead only contest their legal implications for the contract. Paradigm contends that whether these actions constitute a breach of contract is a question that involves factual disputes that cannot be resolved on summary judgment.

■■■ The parties agree that under the Agreement's choice of law provision, Massachusetts law governs the terms of the Agreement. Under Massachusetts law, the interpretation of the contract "is ordinarily a question of law for the court." *Teragram Corp. v. Marketwatch.com, Inc.,* 444 F.3d 1, 9 (1st Cir.2006) (internal quotations omitted). The exception to this rule occurs when "material disputes as to extrinsic facts bear[ ] on the correct interpretation" of the contract. *Id.* (quoting *McAdams v. Mass. Mut. Life Ins. Co.,* 391 F.3d 287, 298 (1st Cir.2004)). "[T]he jury does not become involved when words and context alone are used, but only when extrinsic evidence is at issue." *McAdams,* 391 F.3d at 298. Thus, I turn to the Plaintiff's three breach of contract allega-

tions in order to determine whether they involve disputes over extrinsic evidence that require resolution by a finder of fact.

### 1. Territory limitation

Vertex's first breach of contract allegation is that in January 2006, Paradigm improperly limited the territory assigned to Vertex for the sale of Paradigm's medical devices. The Agreement provides Vertex exclusive rights to sell and distribute products in its territory unless certain narrow conditions are met. According to Paradigm, those narrow conditions were satisfied, namely, that Vertex failed to meet its minimum sales quota requirements.

The territory initially assigned to Vertex is described in Exhibit B of the Agreement as the "states of Georgia, Alabama, and east Tennessee from Tennessee River east to North Carolina." On January 12, 2006, Paradigm's Mark Roberson delivered a letter to Vertex stating that "we hereby must revise your territorial responsibilities." Paradigm alleges that the letter included an enclosure, which was a new version of the Agreement's Exhibit B identifying Vertex's territory as "North Georgia—everything north of I–20 over to Augusta excluding the following hospitals: Grady Memorial, Atlanta medical [sic] Center and Crawford Long Hospital; Chattanooga, TN and Huntsville, AL."

Under ¶ 1 of the Agreement, "COMPANY shall not appoint another AGENT with the right to sell or distribute the Products within the Territory, as long as AGENT is meeting or exceeding the minimum Quota requirements in Exhibit D." Exhibit D of the Agreement states that the quotas are "[t]o be determined within 60 Days of execution & 60 days prior to each subsequent calander [sic] year." Nothing in the Agreement itself defines Vertex's quota assignments.

■ The validity of the territory assignment therefore turns on whether Vertex was indeed assigned quotas, and if so, whether Vertex met these sales requirements. As the moving party, Vertex must prove that as a matter of law, the provisions of ¶ 1 did not permit Paradigm to reassign Vertex's sales territory. In other words, Vertex must prove that it satisfied its quota obligations.

Vertex concedes that quotas were assigned via an email on February 4, 2005, when O'Neill sent Bitting quotas "for the first half of '05." Vertex contends that these quotas were explicitly limited to the first half of 2005, and that no quotas were later assigned for the second half of 2005. Vertex also contends that it never received quotas for 2006, which under the Agreement were to be assigned sixty days prior to January 1, 2006.

Paradigm, however, disputes this portrayal of the record, alleging that quotas were assigned not only on February 4, 2005, but also during the course of the contractual relationship. The only communication in the record, however, apart from the February 4, 2005 email, is a chart emailed from Paradigm's Mark Roberson to Sean Bitting in October 2005, labeled "STALIF Agent Sales." Paradigm describes this chart as Vertex's STALIF quotas for October–December 2005, while Vertex describes the chart as merely a "sales report template." On this record, I find the chart and email communications to be ambiguous. Jennifer Mahonen, a Paradigm employee, wrote in her email accompanying the chart that the chart was a "template"; by contrast Mitch Granger, a Vertex employee, interpreted the chart as providing numbers for Vertex, noting in his email that it "looks like the numbers have already been put into the form." Whether or not to interpret such extrinsic evidence as assignments of quotas is a task for the finder of fact.

No other communication regarding quotas is in the record. Paradigm has presented two documents allegedly listing Vertex's quotas for STALIF sales during two overlapping periods: June 2005 through March 2006; and January 2006 through March 2006. O'Neill avers that Vertex received both sets of quotas. Vertex denies that it received either set of numbers, although Bitting stated in his deposition that he recognized the table with the January 2006 through March 2006 numbers.

In addition to this issue of quota assignments, Vertex also raises the concern that it was not given a new territory list and did not agree to a territory change. Vertex does not identify contractual language that requires Vertex to agree to this change if it results from failure to meet quota obligations. Paragraph 1 of the Agreement merely states that Paradigm can appoint other sales representatives to the territory if Vertex has failed to meet its quota requirements.

Even if the territory limitation was made as a modification, rather than as a reassignment pursuant to ¶ 1, Vertex has failed to meet its burden in the summary judgment context. Paragraph 24.2 of the Agreement states that no modification to the Agreement will be effective "unless made in writing and signed by a duly authorized officer of each party, except as otherwise permitted herein." But according to Paradigm, the parties made an oral modification to their Agreement: Bitting stated in his deposition that the territory change had been discussed verbally; and email communications between Bitting and Roberson demonstrate that Bitting was aware and accepting of the territory limitation. Oral modifications are permissible even for completely integrated agreements when "[m]utual agreement on modification of the requirement of a writing may ... be inferred from the conduct of the parties

and from the attendant circumstances of the instant case." *Cambridgeport Sav. Bank v. Boersner*, 413 Mass. 432, 597 N.E.2d 1017, 1022 (1992) (internal quotations omitted).

Paradigm and Vertex disagree about whether Vertex in fact agreed to the territory change, and seem to dispute more generally whether the parties agreed to permit oral modifications. Given this factual dispute over modification under ¶ 24.2, combined with the factual dispute over quotas and whether Paradigm had reason to alter Vertex's territory under ¶ 1, Vertex cannot obtain summary judgment on the territory limitation issue.

### 2. Termination

Vertex's second breach of contract allegation is that Paradigm improperly terminated the contractual relationship in May 2006. The Agreement's termination provision, outlined in ¶ 18.2, lists several enforceable reasons for termination:

(a) This Agreement may be terminated at any time by COMPANY in any of the following events: ...

(ii) If AGENT fails to cure any breach of a material covenant, representation, warranty, commitment or obligation under this Agreement within thirty (30) days after receipt of written notice from COMPANY of such breach; ...

(iii) If AGENT commits a breach of a material covenant, commitment or obligation under this Agreement which is of such a nature as not to admit of any readily realizable cure, ... in which event termination may be immediate upon notice or; ...

(v) If AGENT repeatedly fails to perform one or more of its duties or obligations whether or not any one or more of such failures themselves constitutes a material breach, in which

event termination will require thirty (30) days notice or; ...

(viii) If AGENT is unable to achieve minimum quota obligations outlined in Exhibit D for three (3) consecutive months, then the COMPANY may terminate Agreement upon 30 days notice to AGENT....

 Vertex challenges the termination on two grounds: that Paradigm had no reason for termination under ¶ 18.2(a) of the Agreement; and that, even if there were reason for termination, Paradigm failed to provide proper notice and opportunity to cure as required by ¶ 18.2(a). With respect to the reasons for termination, I have already discussed the genuine issues of material fact regarding the sales quotas and whether Vertex satisfied its own quota obligations. If a jury were to conclude that Vertex failed to satisfy its quota obligations, then Paradigm would have reason to terminate the Agreement under ¶ 18.2(a) (viii). Moreover, Paradigm argues that it had additional grounds for termination, including failure to rigorously promote the sale of Paradigm products under ¶ 5.1, failure to provide Paradigm with a 12–month rolling forecast on a quarterly basis under ¶ 5.3, and failure to attend required sales meetings, training sessions, and tradeshows in violation of ¶ 5.14. These shortcomings, according to Paradigm, constituted material breaches by Vertex, and therefore provided reason for termination under ¶ 18.2(a)(ii). Because of the parties' underlying factual disagreements, I cannot decide as a matter of law that Paradigm did not have grounds under ¶ 18.2 to terminate the Agreement.

With respect to the Agreement's notice requirement, assessing Paradigm's compliance depends on the grounds for the termination. Under ¶ 18.2(a)(iii), no notice is required for breaches of material covenants, commitments, or obligations that are "of such a nature as not to admit of any readily realizable cure." In any event, Paradigm argues that it did provide notice to Vertex of Vertex's failures to comply with the Agreement, as well as numerous opportunities to cure its breaches. Vertex responds that because these communications were dated several months prior to the termination, they have no relationship to the May 18, 2006 termination. Vertex does not, however, identify any contractual language or principles of law that would preclude notice from being effective because too much time had elapsed between the notice and the termination. *Cf. Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 10 (1st Cir.2006) (affirming the dismissal of a contract claim because of failure to provide any notice, not failure to provide notice within a particular time period). Furthermore, Massachusetts courts have stated that "[c]ompliance with a notice provision is not required where it would amount to a useless gesture." *Shawmut–Canton LLC v. Great Spring Waters of Am., Inc.*, 62 Mass.App.Ct. 330, 816 N.E.2d 545, 553 (2004) (internal citations omitted). If Paradigm had provided renewed notice of Vertex's alleged material breaches in April 2006, thirty days before its termination, this may have been a useless gesture, given Paradigm's multiple efforts to secure improved performance from Vertex.

### 3. Payment of commissions

 Vertex alleges that Paradigm failed to pay two categories of commissions due to Vertex under the Agreement: payments from Vertex's territory that was improperly removed in January 2006; and payments for sales that took place after Paradigm's improper termination on May 18, 2006. The basis for the first prong of the allegation is that the January 2006 territory limitation was improper, and therefore that Vertex is owed commissions from its originally assigned territory. As I have

discussed, it is not appropriate to resolve at this stage the issue of whether Vertex's territory was properly limited. I therefore cannot rule on whether Vertex is owed commissions from this territory after the territory was reassigned to other sales agents.

Likewise, Paradigm's liability for failure to pay commissions after May 2006 depends on whether Paradigm's termination of the Agreement was proper. The termination issue also cannot be resolved at this stage of the litigation. Consequently, the question whether Paradigm owes commissions to Vertex for the period following May 18, 2006 cannot be resolved on the summary judgment record before me.

## B. Georgia Wholesale Distribution Act

Count II of the Plaintiff's Complaint is that Paradigm has violated the Georgia Wholesale Distribution Act ("GWDA"), Ga. Code Ann. §§ 10–1–700 to –704. Under the GWDA, when a contract between a principal and a sales representative is terminated, "the principal shall within 30 days after the termination of the contract pay all commissions due to the sales representative." Ga.Code Ann. § 10–1–702(a). Failure to comply with this requirement results in liability for all amounts due to the sales representative "according to the terms of the contract," as well as exemplary damages and attorney's fees. § 10–1–702(b).

The GWDA allegation raises a threshold question: whether the GWDA can affect the rights of the parties, given the Agreement's choice of Massachusetts law to govern the terms of the Agreement.

■ The parties contest the relationship between the GWDA and the choice of law provision. The GWDA is a Georgia statute, but ¶ 25.1 of the Agreement states that "Massachusetts law exclusively shall govern all terms of this Agreement, including this paragraph." Because ¶ 25.1 states

that Massachusetts law governs the interpretation of ¶ 25.1 itself, I turn to Massachusetts law to determine whether a provision such as the GWDA is barred by the Agreement's choice of law provision. Massachusetts honors choice of law provisions in contracts, provided that they do not conflict with public policy. *Morris v. Watsco, Inc.*, 385 Mass. 672, 433 N.E.2d 886, 888 (1982).

Although the GWDA in particular has not been addressed in Massachusetts, federal decisions dealing with contract disputes have interpreted contractual choice of law provisions and provide guidance for determining whether a particular claim under another state's statute may be asserted. The First Circuit, applying Massachusetts law, found that when a contract chooses a particular state's law to govern the contract, a party cannot then bring a claim under a statute of a different state if that statutory claim is essentially duplicative (or a more serious version) of a contract claim. *Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*, 986 F.2d 607, 610 (1st Cir.1993). In *Northeast Data*, the First Circuit faced a contract governed by California law, and a Massachusetts statutory claim under Mass. Gen. Laws ch. 93A ("Chapter 93A"). The court concluded that the Chapter 93A claim was subject to the choice of law provision, and could not survive because California law governed the dispute. "[W]hen parties agree that 'contract related' claims will be tried under, say, the law of California, they do not mean that a claim of 'serious' or 'rascal-like' breach of contract [recognized under Chapter 93A] will be tried under the law of Massachusetts." *Northeast Data*, 986 F.2d at 610.

In *Trent Partners and Assocs., Inc. v. Digital Equip. Corp.*, 120 F.Supp.2d 84 (D.Mass.1999), I considered whether I

could hear a Massachusetts Chapter 93A claim in a dispute transferred from the Maryland federal district court. Because the case had been transferred to the District of Massachusetts from Maryland under 28 U.S.C. § 1404, Maryland law, the law of the transferor forum, governed the dispute. *Id.* at 95. I found that a cause of action under Chapter 93A "may only be properly before me if Massachusetts law applies to the issues underlying the claim." *Id.* at 97. Because the Chapter 93A claim sounded primarily in tort, and because under Maryland choice of law principles, Maryland tort law governed such a dispute, the Massachusetts tort-like claim was barred from consideration. *Id.* at 98. I found, however, that the contract portion of the Chapter 93A claim was governed by the parties' particular choice of law provision, *id.* at 98, which specified that Massachusetts law would govern the interpretation, construction and performance of the contract. *Id.* at 95.

■ Vertex attempts to distinguish *Trent Partners* and *Northeast Data* on the grounds that the claims there were based in contract, while the GWDA is aimed at protecting sales representatives. This purported distinction makes no difference. The Georgia statute essentially specifies the requisite time frame for complying with contractual duties to pay commissions to a sales representative, and the principal's liability for failure to do so. Vertex's GWDA claim is essentially a contract claim seeking to import additional contractual obligations drawn from the Georgia statute. The GWDA, by regulating the framework for paying overdue commissions, ultimately attempts to provide further regulation of the terms set out in the Agreement, which already include "Company's Obligations" (Agreement ¶ 6), "Payment" (*id.* ¶ 9.2), and "Remedies" (*id.* ¶ 18.4). As relevant here, the statute is directed to contractual matters. Such regulation by Georgia law is barred by the

Agreement's choice to have "Massachusetts law exclusively ... govern all terms of this Agreement." (*Id.* ¶ 25.1).

Vertex attempts to draw an analogy between the GWDA and Massachusetts Chapter 93A, citing two cases in which courts permitted a Chapter 93A claim to proceed despite contract provisions favoring non-Massachusetts law. In *Jacobson v. Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 646 N.E.2d 741 (1995), the Supreme Judicial Court concluded that a California choice of law provision did not bar a Massachusetts Chapter 93A claim. *Jacobson* relied upon two main rationales. First, the Massachusetts claim in *Jacobson* involved "precontract violations of G.L. c. 93A," and "the forum selection clause does not apply to wrongs that Mailboxes allegedly committed before the parties entered into a contractual relationship." *Id.* at 745–46. This rationale does not apply here. Vertex's GWDA claim does not allege precontract violations, but instead alleges conduct that is identical to that which gives rise to the breach of contract claim.

The other rationale in *Jacobson* was that, because "separate actions [in separate forums] should not be encouraged," *id.* at 746, the trial court was required to identify the focus of the plaintiff's claims before dismissing the Massachusetts claim. If the focus of the lawsuit were found to be precontract conduct alleged in the Chapter 93A claim, then the trial judge should not enforce the choice of law provision; if the focus were instead to be the breach of contract claim, then the trial judge should enforce the provision and bar the Chapter 93A claim. *Id.* at 746. In this case, the focus of Vertex's claims is its breach of contract claim, and therefore under *Jacobson*, I should enforce the Massachusetts choice of law provision and bar the Georgia claim.

Vertex also discusses *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 612 (2d Cir.1996), in which the Second Circuit cited *Jacobson* for the principle that if the choice of law clause states only that non-Massachusetts law governs "the agreement," without stating that it governs "the rights of the parties," then the clause does not bar a Chapter 93A claim. *Id.* I do not share the Second Circuit's reading of *Jacobson.* I recognize that the Supreme Judicial Court in *Jacobson* did state in a footnote that the disputed agreement "does not state that the rights of the parties are to be governed by California law." *Jacobson*, 646 N.E.2d at 746 n. 9. But the court made this point only to show that the agreement did not explicitly "purport to bar the application of" Chapter 93A. *Id.* Nevertheless, under *Jacobson*, the ability to assert a Chapter 93A claim, notwithstanding a contrary choice of law provision, ultimately depends on whether the alleged violations occurred prior to the contract, and whether the Massachusetts tort-like claim (as opposed to the contract claim) is the focus of the plaintiff's litigation. *See id.* at 745–46.

The GWDA claim before me turns on whether the statute's non-waiver clause has applicability in this case. The GWDA provides that "[t]he provisions of this article may not be waived," and directs that "the courts of this state shall not recognize any purported waiver of the provisions of this article, whether by expressed waiver or by attempt to make a contract or agreement subject to the laws of another state." Ga.Code Ann. § 10–1–703. Vertex argues that because of this non-waiver provision, a Massachusetts choice of law provision cannot effectively bar the GWDA from governing the payment of overdue commis-sions. Perhaps, if a GWDA claim were properly raised in Georgia state court,[1] the claim would be heard under Georgia choice of law principles as informed by the GWDA, notwithstanding a contractual choice of law provision specifying Massachusetts law. The statute does not—nor could it—purport to govern another forum's choice of law principles when the GWDA claim is brought outside Georgia courts. Vertex has not persuaded me that the non-waiver provision applies outside of Georgia, i.e., that the statute purports to prohibit courts of other states from barring the provision's application under their own state choice of law principles. Given the disposition of this legal issue, which both parties have had a full opportunity to develop and contest, I will grant summary judgment to Paradigm on Count II despite the lack of a cross-motion for summary judgment.

## CONCLUSION

For the reasons discussed more fully above, I DENY the Plaintiff's Motion for Partial Summary Judgment. (Docket No. 16.) Moreover, the submissions of the parties having demonstrated that the GWDA is barred by their choice of law agreement, I grant, *cf. Bank v. Int'l Bus. Mach. Corp.*, 145 F.3d 420, 431 (1st Cir. 1998), summary judgment to the Defendant as to Count II.

---

1. Paragraph 25.1 of the Agreement at issue in this case, however, includes a forum selection clause under which "[t]he parties agree that all disputes in any way relating to, arising under, connected with, or including" to this Agreement "must be litigated in courts sitting in Massachusetts."