# United States Court of Appeals
## For the First Circuit

---

No. 14-1922

CARL D. McCUE,

Plaintiff, Appellant,

v.

SETH BRADSTREET, III,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

---

Before

Barron, Circuit Judge,
and Souter,[*] Associate Justice.[**]

---

David G. Webbert, with whom Max R. Katler and Johnson, Webbert
& Young, LLP, were on brief, for appellant.
Janet T. Mills, Attorney General, with whom Christopher C.

---

[*]  Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.
[**]  Judge Lipez, one of the three panel members initially
assigned to hear this appeal, recused shortly before oral argument.
The remaining two panel members, Justice Souter and Judge Barron,
heard arguments without a third member.  We conclude that, as a
quorum of the initial three-member panel, we are authorized to
decide this case under 28 U.S.C. § 46(d).  See Wal-Mart Stores,
Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 100 n.* (2d Cir. 2005);
Murray v. Nat'l Broad. Co., 35 F.3d 45, 46-47 (2d Cir. 1994).

Taub and Susan P. Herman, Assistant Attorneys General, were on brief, for appellee.

_____

July 16, 2015

_____

**BARRON**, <u>Circuit Judge</u>.  In this appeal, a Maine dairy farmer seeks to reverse a summary judgment ruling that rejected his First Amendment retaliation claim against the former Commissioner of the Maine Department of Agriculture.  The suit alleges that, while in office, the Commissioner used the state's regulatory apparatus to retaliate for the First Amendment-protected conduct that the farmer engaged in to resolve an earlier business dispute between the two men.

Complicating the dairy farmer's claim, though, are not only longstanding concerns that his farm had failed to comply with state agricultural and environmental regulations, but also the Commissioner's decision soon after taking office to recuse himself from regulatory matters involving the farmer.  The District Court noted each of these aspects of the case in awarding summary judgment against the farmer.  And we agree with the District Court that, in consequence of those features of the case, the farmer failed to make a sufficient showing to survive summary judgment with respect to the three adverse regulatory actions that the Department was alleged to have taken after the Commissioner's purported recusal.

Unlike the District Court, however, we conclude that there is a genuine issue of material fact with respect to whether the Commissioner's retaliatory intent was a substantial or motivating factor in the one alleged adverse action that occurred

- 3 -

prior to the recusal -- namely, the alleged decision by the Department of Agriculture to allow the state Department of Environmental Protection to exercise regulatory power against the farmer. We reach this conclusion because the District Court failed to provide a sufficient ground for its conclusion that, even though the record provided a basis from which a reasonable jury could conclude that the Commissioner's retaliatory intent was a substantial or motivating factor in bringing about that particular change in the Department of Agriculture's enforcement posture in May 2006, the Department was sure to have made that decision then anyway. And the Commissioner has not identified any other basis for affirming the District Court on that point.

That said, it is not clear what damages, if any, follow from this one discrete respect in which we hold that a jury could reasonably infer that a First Amendment violation occurred. And that is particularly true given that we conclude that the Commissioner's retaliatory intent was not a substantial or motivating factor in the three separate regulatory actions the Department took against the farmer in the months that followed. But as the parties do not address whether any damages may be attributed to that single, earlier adverse regulatory action, we do not hazard to resolve the damages issue on our own. We thus reverse the grant of summary judgment in part and remand for further proceedings.

I.

Carl McCue is the dairy farmer who brings the suit.  He is also the appellant.  He had a long history of alleged violations of Maine agricultural and environmental regulations, which we briefly recap.

According to government inspectors and public complaints, McCue would overfill his manure storage pits, which would then sometimes leak.  He would also spread too much manure -- sometimes up to six inches deep -- on fields sloping to a nearby protected waterway.  Waterlogged manure runoff was sometimes so great that it would cause visible discoloration in the nearby stream.  One inspection of his farm by authorities also found thirteen dead cows lying in one of McCue's fields.

Seth Bradstreet, III, is a potato farmer and McCue's neighbor.  He is the appellee.  He was, at the time that McCue contends is critical, the state's Commissioner of Agriculture and thus the head of the Maine Department of Agriculture (DOA).

The origins of the tensions between the two men may be traced to at least October 2004.  At the time, the two were not in contact with one another as regulator and regulated party.  Bradstreet was not even then in the Maine state government.  The two men were instead parties to a private business deal.  Specifically, McCue had leased land from Bradstreet to grow corn

for his cows, as McCue ran a very large dairy farm and Bradstreet had farm land available to lease for such a purpose.

The troubles between the two men began a year later, in October 2005. That was when a dispute broke out between them in connection with that lease. McCue told Bradstreet that he was claiming a crop subsidy from the United States Department of Agriculture (USDA) related to crops that were grown on the leased land. Bradstreet, however, also intended to claim the subsidy on the basis of his ownership of the land. And it appears that the subsidy could not be claimed by both Bradstreet and McCue. The record indicates that, in the event of a dispute over a crop subsidy, a local committee set up to administer the USDA's crop subsidy program makes the initial award determination. The disappointed party then may appeal up to the USDA.

Bradstreet admits that, upon learning of McCue's intention to pursue the subsidy, he became "very upset." In particular, Bradstreet admits that, in a phone conversation with McCue, he threatened to "ruin" and "bury" McCue and "put [him] out of business" in consequence of McCue's pursuit of the subsidy. Bradstreet, who the complaint alleges was also the chairperson of the local committee that would adjudicate the subsidy dispute in the first instance, admits that he continued by saying: "Go to the state committee. Do what you got to do. Appeal it. Damn it. Actions like that, you shouldn't be in business."

In December 2005, the local committee awarded Bradstreet the subsidy. McCue then appealed that determination up the line within the USDA. McCue did so in hopes of securing the subsidy for himself.

A few months later, on March 27, 2006, while McCue's USDA appeal was still pending, Bradstreet became the Maine Commissioner of Agriculture and the head of the DOA. Shortly thereafter, in April of 2006, McCue prevailed in his USDA appeal. As a result, on April 26, 2006 -- only a month after Bradstreet had taken the reins at the DOA -- the USDA demanded that Bradstreet repay approximately $7,000 in crop subsidies.

According to McCue, over the next several months, the DOA -- with Bradstreet at the helm -- took four adverse regulatory actions that sprang from Bradstreet's earlier-expressed desire to take action against McCue for McCue having availed himself of the USDA's appeals process. Specifically, McCue contends that:

(1) In early May 2006, the DOA decided to stop protecting McCue from the regulatory authority of the Maine Department of Environmental Protection (DEP), as the DOA allegedly had been doing for a number of years despite concerns about McCue's failure over that time to comply with statutory and regulatory requirements for which the DEP had licensing and enforcement power.

(2) On June 27, 2006, DOA and DEP officials informed McCue that his farm was being placed under "strict scrutiny."

(3) In November and December 2006, the DOA revoked McCue's provisional Livestock Operations Permit, which he needed under state law to operate his dairy farm. See Me. Rev. Stat. tit. 7, § 4205; 01-001 Me. Code R. ch. 565, § 8(1).

(4) And, finally, in December 2006, the DOA denied McCue's request for a variance that would have enabled him to spread manure from his cows on his fields during the winter months. See Me. Rev. Stat. tit. 7, § 4207 (prohibiting spreading absent a variance).

In the wake of these actions, the DEP licensed McCue, inspected his property, and issued several notices of violation of his license conditions. The DEP sent copies of those notices to the federal Environmental Protection Agency (EPA). The EPA, citing the DEP's licensing, inspection, and enforcement actions, then began administrative and judicial proceedings against McCue in December 2006 and January 2007. Those EPA proceedings resulted in McCue losing his farm.

In response to the four alleged adverse actions, McCue brought this suit for damages against Bradstreet in federal district court in Maine under 42 U.S.C. § 1983.[1] He claimed

---

[1] That statute provides: "Every person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured

Bradstreet had violated his First Amendment rights through the adverse actions the DOA took.

To win on that First Amendment damages action, McCue was required to show "that [he] engaged in constitutionally protected conduct, and that this conduct was a substantial or motivating factor for the adverse . . . decision." Padilla-García v. Rodríguez, 212 F.3d 69, 74 (1st Cir. 2000). Even assuming McCue could succeed in making that showing, however, he still would not necessarily win. And that is because Bradstreet would then have "the opportunity to establish that [the DOA] would have taken the same action regardless of the plaintiff's [protected conduct] -- commonly referred to as the Mt. Healthy defense." Id. (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977));[2] see also Acevedo-Diaz v. Aponte, 1 F.3d 62, 67 (1st Cir. 1993) (stating that "the burden of persuasion itself passes to the defendant[]" to make out the Mt. Healthy defense "once the plaintiff produces sufficient evidence from which the fact finder reasonably can infer that the plaintiff's

_____

in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.

[2] Padilla-García, 212 F.3d at 74-78, applied this two-step framework in the context of public employment, where it originated. In Collins v. Nuzzo, 244 F.3d 246, 251-52 (1st Cir. 2001), we applied the same framework in the context of government licensing and regulation.

protected conduct was a 'substantial' or 'motivating' factor behind [the adverse action]" (emphasis removed)).

Before the case went to trial, Bradstreet moved for summary judgment. In ruling on that motion, the District Court accepted the parties' stipulation that McCue's appeal to the USDA of the subsidy determination was constitutionally protected speech. The District Court thus ruled that McCue had met one element of a retaliation claim by showing that he had engaged in "protected conduct." Acevedo-Diaz, 1 F.3d at 66-67. The District Court also concluded that McCue satisfied another of the elements of such a claim. That was because the District Court ruled that all four of the DOA's actions about which McCue complains qualified as "adverse" actions because they would "deter a reasonably hardy individual from exercising his constitutional rights." Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011) (original alterations and quotation marks omitted).

The District Court then proceeded to address the only point of dispute that is before us in this appeal: the role, if any, that Bradstreet's purported desire to retaliate for McCue's protected conduct played in the alleged adverse actions against McCue. To that end, the District Court first considered whether McCue had raised a genuine issue of material fact with regard to whether retaliation for McCue's protected conduct was a substantial or motivating factor in any of the four adverse

- 10 -

regulatory actions to which McCue claims the DOA subjected him. The District Court then considered whether, even if McCue could make that showing, Bradstreet could nonetheless conclusively make out the Mt. Healthy defense in response by showing that a reasonable jury would be required to conclude from the record that those actions would have occurred even if McCue had not engaged in protected conduct. In performing this two-step analysis, the District Court decided to examine each of the four alleged adverse regulatory actions independently.

As to the first of the four alleged adverse actions, the District Court began its analysis as follows. The District Court concluded that there was a genuine issue of material fact as to whether retaliation for McCue's protected conduct was a substantial or motivating factor in the DOA's alleged decision in May 2006 to allow the DEP to exercise regulatory power against McCue. In so ruling, the District Court pointed to the fact that the DOA's decision to let the DEP exercise such authority was made very soon after Bradstreet had taken office and had learned that McCue had successfully appealed the USDA's initial decision to award the subsidy to Bradstreet. The District Court found that this timing, coupled with Bradstreet's earlier statements promising to "ruin" McCue and the fact that Bradstreet's recusal from McCue-related matters came later, provided a sufficient basis

- 11 -

in the record from which a reasonable jury could find for McCue on this first step of the inquiry.

Nevertheless, the District Court went on to rule that no reasonable jury could find for McCue as to that adverse regulatory action. And that was because the District Court ruled that Bradstreet had succeeded at the second step of the inquiry by conclusively making out the so-called Mt. Healthy defense. Specifically, the District Court ruled that, with respect to this May 2006 decision, a reasonable jury would have had to find that the DOA would have made the same decision even if McCue had not made his appeal of the subsidy to the USDA.

The District Court then turned to a consideration of the three other adverse regulatory actions that McCue claims subsequently occurred. As to each of these later-made actions, the District Court concluded that -- in part because Bradstreet had by then purported to recuse himself from any matters involving McCue -- no reasonable jury could find that retaliatory intent was a substantial or motivating factor in the DOA's decisionmaking. And, in any event, the District Court also ruled that, given McCue's long record of regulatory noncompliance, a reasonable jury would have to find that the DOA would have taken those three actions anyway.

McCue now timely appeals from this grant of summary judgment. He contends that the District Court erred in finding

- 12 -

that the record supplied no basis from which a reasonable jury could find that McCue's "constitutionally protected conduct . . . was a substantial or motivating factor" for the DOA's three actions taken after Bradstreet recused himself from McCue-related matters. Padilla-García, 212 F.3d at 74.  McCue also contends with respect to all four actions that the District Court erred in finding that Bradstreet had conclusively "establish[ed] that [the DOA] would have taken the same action[s] regardless of [McCue's protected speech] -- commonly referred to as the Mt. Healthy defense."  Id. (citing Mt Healthy, 429 U.S. at 287).

II.

Because we are reviewing an award of summary judgment to the defendant, McCue need not show that he is entitled to prevail on his constitutional claim in order to succeed in his appeal to us.  Instead, we may affirm the grant of summary judgment against McCue only if we, like the District Court, conclude that "the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014), cert. denied, 135 S. Ct. 1183 (2015).  In making that determination, moreover, "[o]ur review of the district court's grant of summary judgment is de novo, drawing all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation."  Shafmaster v. United

- 13 -

States, 707 F.3d 130, 135 (1st Cir. 2013) (internal citations and quotation marks omitted).

III.

In evaluating the record with this standard in mind, we follow the District Court's lead. We thus focus first on the DOA's alleged decision in May 2006 to turn McCue over to the DEP for regulatory enforcement. We then consider the three other alleged adverse regulatory actions -- each of which occurred months later -- that McCue contends also were taken in violation of the First Amendment. Finally, we consider McCue's contention that the District Court erred in considering each of these four actions in this "compartmentalize[d]" manner and thus that we should not repeat the mistake by considering them only one-by-one.

A.

The first adverse action that McCue attributes to retaliation for his protected conduct is the DOA's alleged decision in May 2006 to stop protecting McCue from DEP regulation. We agree with the District Court that a reasonable jury could find that McCue had made the requisite showing that such retaliation was a substantial or motivating factor for such a decision. We disagree, however, with the District Court's further conclusion that, on this record, a reasonable jury would be compelled to conclude that the DOA would have made that May 2006 decision even if McCue had not engaged in the protected conduct.

1.

To explain why we believe the District Court was right to conclude that, as an initial matter, a jury could find that McCue had shown that retaliation was a substantial or motivating factor in the DOA's May 2006 decision, we need to lay a bit of groundwork. We explain first why we believe the record could reasonably support a finding that the relevant enforcement posture of the DOA did in fact shift soon after Bradstreet took the helm at the DOA. We then explain why we believe the record also provides support -- relatively weak though it is -- for a reasonable inference that such a shift may be attributed to Bradstreet's desire to retaliate against McCue for appealing the USDA crop subsidy rather than to a simple (and wholly warranted) desire to bring McCue into compliance with prevailing legal requirements.

The record does supply evidence from which a jury could infer that, before Bradstreet came on the scene at the DOA, the Department had a policy in place of protecting McCue from DEP regulation. There is no doubt that, up until that time, McCue was hardly a model farmer. To the contrary, the record shows that McCue's farming practices had long generated concern about the farm's egregious failures to comply with Maine's agricultural and environmental regulations. These concerns stretched back to at least the year 2000, and, in fact, the record shows complaints about those practices dating back as far as 1985. Yet, despite

McCue's seemingly poor history of compliance, the record provides a basis from which a jury could conclude that the DOA had all the while protected McCue from DEP enforcement actions until at least May of 2006, and thus until after Bradstreet took over at the DOA, which did not occur until late March of that year.

In so concluding, we recognize that there is -- as Bradstreet contends -- evidence in the record that shows that the DOA and the DEP made some efforts to clamp down on McCue before Bradstreet took up his post at the DOA. In that regard, it does appear that in the late summer of 2005, the DOA worked with the DEP in taking action against McCue.

Specifically, the record shows that the DEP and the DOA had jointly inspected McCue's property in August 2005. And, as shown in an August 26 letter to a local activist, it appears the two agencies had jointly decided at that time to "develop[] a set of short term corrective actions as well as more substantial longer term changes to insure the discharge [into a stream bordering McCue's farm] that occurred this spring will not be repeated." Further, the record shows that on August 29, 2005, the DEP sent a letter to McCue issuing a notice of violation of Maine environmental law prohibiting the discharge of pollutants (such as manure) into bodies of water without a permit. See Me. Rev. Stat. tit. 38, § 413(1).

But far from conclusively showing that the DOA had decided to allow the DEP to take enforcement action against McCue before Bradstreet took over the Department, the record also contains evidence suggesting the exact opposite. In particular, the record provides support for a conclusion that this DEP enforcement action in August 2005 catalyzed a severe inter-departmental conflict between the DOA and the DEP. And, in addition, the record provides support for the conclusion that the two departments soon thereafter resolved the dispute over the DEP's taking action against McCue through a joint agreement that provided that the DOA, alone, would take the lead on all enforcement against McCue and that the DEP enforcement actions would "evaporate." By February 22, 2006, moreover, an email from a DEP official, James Crowley, showed that Crowley at that time thought the DEP "can't 'take over' the case, for enforcement or unilateral licensing, unless requested to do so from Agriculture."

Thus, far from showing conclusively that the DOA had given the green light to the DEP's exercise of regulatory power as early as August of 2005, the record also supports the contrary conclusion: that the DOA was still protecting McCue from DEP enforcement by that month's end. And the record also provides support for the further conclusion that the DOA had maintained this protective posture until after Bradstreet came on board. That is because there is nothing in the record to indicate that any

such agreement between the DOA and the DEP to block the DEP from asserting its authority was no longer in effect when Bradstreet arrived at the DOA. The record thus does not preclude a reasonable jury from concluding that the DOA continued to prevent the DEP from exercising regulatory power against McCue up until Bradstreet took office.

This background concerning the state of play at the time that Bradstreet took over at the DOA matters for the following reason. There are several emails from May of 2006 -- and thus after Bradstreet took over -- that are in the record and that indicate that the DOA had by that time stopped interceding with the DEP on McCue's behalf. In particular, an email from Crowley, the DEP official, dated May 10 noted that it "looks like Agriculture is going to give [McCue] up after all." And Crowley's emails from May 30 and 31 to a local community activist confirmed that the DOA had "handed [McCue] over" to the DEP for licensing and enforcement.

Given these emails, a reasonable jury could infer that a shift in the DOA's enforcement posture relative to the DEP had occurred in May 2006 -- or, in other words, only once Bradstreet had taken over at the DOA. Crowley's May 10, 2006, email comports with that conclusion by indicating -- in the present and present-progressive tenses -- that it "looks like Agriculture is going to give [McCue] up after all." And so, too, does Crowley's subsequent

- 18 -

email at month's end speaking in the past tense about how McCue by that time had been "handed over." Hence, the record does not compel a finding that the alleged May 2006 shift within the DOA of which McCue complains had occurred prior to Bradstreet taking office. And thus the record does not require the conclusion that the shift occurred too early for it to have been due to Bradstreet's desire to retaliate against McCue. See Collins v. Nuzzo, 244 F.3d 246, 252 (1st Cir. 2001) (concluding that plaintiff seeking business license had not shown retaliation because "[t]he statements attributed to [a city councilor and defendant] were in 1991, before [the plaintiff] filed a lawsuit" and engaged in protected conduct (emphasis added)).

2.

With the timing of the shift out of the way, we come, then, to the next issue. And that issue is whether the record supplies sufficient support for a reasonable jury to conclude that McCue has made his required showing that retaliation was a substantial or motivating factor in bringing about this alleged May 2006 shift in the DOA's regulatory enforcement posture toward the DEP. As to this issue, we, like the District Court, conclude that the record does provide the basis for a reasonable inference to that effect. Three pieces of evidence, viewed cumulatively, lead us to this conclusion.

- 19 -

The first piece of evidence is Bradstreet's concession that he became "very upset" and threatened to "ruin" and "bury" McCue and "put [him] out of business" when he learned in late October 2005 that McCue would challenge him for the crop subsidy. Of course, we do not simply presume that the threats Bradstreet expressed toward McCue as a private businessman became his official retaliatory intent in late March 2006 when Bradstreet took the reins at the DOA. After all, government officials ought to leave their private prejudices at the door upon ascending to public office.

But in declining to adopt such a presumption about Bradstreet's mindset towards McCue as Commissioner and head of the DOA, we need not doubt the possibility of Bradstreet's persisting retaliatory intent. In this case, after all, such intent was expressed strongly and in terms that announced Bradstreet's intention to take adverse action against McCue in the future. Thus, Bradstreet's concession about the statements he made in late October 2005 about what he intended to do to McCue supplies at least a foundation, in light of the evidence that follows, for inferring that Bradstreet harbored a retaliatory intent as Commissioner in early May 2006.

The second piece of evidence is the close proximity in time between April 26, 2006 -- the moment Bradstreet received the first letter from the USDA notifying him that McCue had prevailed

in his appeal and demanding repayment of about $7,000 in crop subsidies -- and the DOA's alleged shift in enforcement policy, first referenced on May 10, 2006. There was a time-lag of less than two weeks between the moment Bradstreet learned that he had lost the USDA subsidy dispute (about which he had previously threatened to "bury" McCue) and the Crowley email documenting that the DOA would hand McCue over to the DEP for the possible exercise of licensing and enforcement authority.

To be sure, five months passed between the initiation of McCue's USDA appeal in December 2005 and the decision to allow the DEP to pursue McCue that Crowley's May 10, 2006, email had referenced. That lag might be too much, in this case, on its own to support a reasonable inference that retaliation was the substantial or motivating factor in the DOA acting as it did. But Bradstreet did not take office until March 27, 2006. The closeness in time between Bradstreet's taking office, learning that he had lost the appeal, and the decision regarding the DEP's authority vis-à-vis McCue thus does offer some circumstantial evidence from which a jury could infer that Bradstreet used his newfound regulatory power as soon as he could to make good on his earlier stated intention to "bury" McCue. See Guilloty-Perez v. Pierluisi, 339 F.3d 43, 57 (1st Cir. 2003) (finding under the circumstances of that case that "proximity in time between the protected activity and the alleged retaliation is circumstantial evidence of

- 21 -

motive"); <u>Acevedo-Diaz</u>, 1 F.3d at 69 (noting that "[m]ere temporal proximity" on its own was insufficient to establish substantial or motivating causation in the circumstances of that First Amendment retaliation claim, but "timing . . . may be suggestive of discriminatory animus" in conjunction with other evidence (citations and quotation marks omitted)).

The third and final piece of evidence in McCue's favor on this point is what the record shows -- and fails to show -- about who made the decision to allow the DEP to pursue McCue and why that decision was made. We start with the question of who made it.

Bradstreet correctly points out that the record contains no direct evidence that shows <u>Bradstreet</u> was responsible for the decision in late May to allow the DEP to take enforcement action against McCue. But Bradstreet's deputy, Ned Porter, stated that the decision to hand McCue over to the DEP would have come from high in the DOA hierarchy, and Porter did not recall making that decision himself or communicating it to someone else. Porter did state that he had no reason to believe Bradstreet made the decision. But Porter was unable to identify who did make it. A reasonable trier of fact could thus infer that Bradstreet played a role in that decision.

As to why that decision was made, the record contains no direct contemporaneous evidence showing the actual reason.

Crowley, the DEP official, and Porter, the DOA deputy commissioner, each stated in affidavits and depositions that their understanding in May 2006 was that the DOA allowed DEP enforcement against McCue because of McCue's long history of noncompliance with the DOA and DEP regulations and thus not because of Bradstreet or his retaliatory intent. And there is no doubt that the record supplies a basis for concluding that action undertaken for that entirely legitimate reason would have been warranted. Concerns about McCue's farming practices were serious and well known.

But such post-hoc recollections, unsupported by contemporaneous evidence about why the decision was in fact made, need not compel the fact-finder on this record to conclude that the later-stated reason was the actual reason for the DOA's action. After all, neither Crowley nor Porter could identify who exactly made the decision in question, and the evidence does provide a basis for concluding that someone high up in the DOA made the decision. Moreover, the head of the DOA at that time -- Bradstreet -- had just learned that McCue had prevailed in the dispute between them. And it was that very dispute that had occasioned Bradstreet to make the earlier statements to McCue that seemed to promise retaliation. Cf. Anthony v. Sundlun, 952 F.2d 603, 606 (1st Cir. 1991) ("[W]hat an actor says is not conclusive on a state-of-mind issue. Notwithstanding a person's disclaimers, a contrary state of mind may be inferred from what he does and from a factual mosaic

- 23 -

tending to show that he really meant to accomplish that which he professes not to have intended.").

Thus, in light of all the facts of this case, we conclude the District Court was right on this first step. A reasonable trier of fact could conclude that Bradstreet retained an earlier-expressed retaliatory intent after he took office, and this intent was a substantial or motivating factor in the DOA's decision in May 2006 to allow the DEP to assert its enforcement and licensing authority over McCue.

3.

Still, there remains the possible Mt. Healthy defense. This defense ensures that a plaintiff is not put "in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." Mt. Healthy, 429 U.S. at 285. To succeed in making out that defense to the degree necessary to win on summary judgment, Bradstreet would need to show that the record would compel a reasonable jury to conclude by a preponderance of the evidence that the DOA would have taken the same adverse action against McCue even if McCue had not engaged in protected conduct. See Padilla-García, 212 F.3d at 74. The District Court concluded that Bradstreet had met his burden of showing just that. But we disagree.

The District Court supported its conclusion regarding the Mt. Healthy defense by pointing to two facts in the record.

Neither of these facts, however, compels a reasonable fact-finder to conclude that the decision by the DOA in May 2006 to allow DEP enforcement would have occurred even absent McCue's protected conduct.

First, the District Court relied on evidence concerning some joint action that the DOA and the DEP had taken regarding McCue before Bradstreet came to the DOA. The record shows, as we have mentioned earlier, the two departments carried out a joint inspection of McCue's property in August 2005. The District Court then relied on evidence supporting the conclusion that, following that inspection, the two departments had jointly decided to "develop[] a set of short term corrective actions as well as more substantial longer term changes to insure the discharge [into the stream near McCue's property] that occurred this spring will not be repeated." (Second alteration in original.) The District Court concluded that this evidence showed the DOA was already in the process of letting the DEP exercise its authority to bring McCue into compliance well before Bradstreet came on the scene at the DOA.

But we do not believe such evidence is as conclusive as the District Court believed it to be. A letter from a regulator to an activist promising to work toward bringing McCue into compliance need not compel the conclusion that the DOA would actually turn McCue over to the DEP for licensing and enforcement.

Further, as we have noted, after the DEP sent its August 29 letter to McCue issuing a notice of violation with respect to water discharge regulations, the DOA and the DEP appear to have reached a joint agreement.  The record suggests, moreover, that this agreement provided that the DOA, alone, would take the lead on all enforcement and the DEP enforcement actions would "evaporate."

Thus, rather than conclusively showing that the DOA would have made the May 2006 decision even if McCue had not appealed the subsidy determination, the record provides a basis from which a reasonable jury could find that a modus vivendi between the DOA and the DEP had been reached before Bradstreet took office.  And the record also provides support for the inference that this pact remained in place when Bradstreet arrived at the DOA, thereby ensuring (absent some change) that the DOA would serve as the gatekeeper for any action by the DEP against McCue -- a gatekeeping role by the DOA that, the record also provides a basis to conclude, had to that point kept the DEP from striking out on its own.  Thus, the record does not show -- conclusively -- that the DOA had already freed up the DEP and thus that the May 2006 decision to let the DEP assert regulatory power over McCue would have occurred even if McCue had never engaged in the protected conduct that he contends led Bradstreet to retaliate against him.

The District Court, in ruling for Bradstreet, also noted that Shelley Doak, a DOA official, stated in an affidavit that when she became head of the manure management program in September 2005, the DOA was "under increasing pressure to take measures to address" McCue's manure problems. But this evidence, too, is not conclusive with respect to the Mt. Healthy defense.

"[I]ncreasing pressure" could lead to enforcement against McCue, encouragement for McCue to take greater steps toward compliance while still tolerating significant noncompliance by him, or no enforcement of any kind. Nor is there any indication in the record that would compel a fact-finder to conclude that such "increasing pressure" in September 2005 ultimately led the DOA -- at some point prior to Bradstreet becoming Commissioner -- to break the no-enforcement agreement with the DEP that a jury reasonably could find the DOA had earlier reached. Thus, the record evidence concerning Doak's statements about increasing pressure on the DOA to take action against McCue also does not suffice to show that Bradstreet is entitled to summary judgment on the basis of a Mt. Healthy defense as to this adverse action.

Although the District Court relied solely on the two facts discussed above, Bradstreet urges us to uphold the District Court on an alternative, broader ground for finding the Mt. Healthy defense conclusively proved -- namely, that the DOA would have taken that May 2006 action anyway because of McCue's egregious

noncompliance with applicable regulations.  But, having considered that argument, we do not find that it provides a sufficient alternative basis for affirming the District Court.

The Mt. Healthy defense, at the summary judgment stage, requires Bradstreet to show that the record would compel a reasonable jury to find that the adverse action would have occurred anyway, not merely that such action would have been warranted anyway.  To hold otherwise would expand the Mt. Healthy defense beyond its rationale.  The purpose of the Mt. Healthy defense is to ensure that a plaintiff is not put "in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing."  Mt. Healthy, 429 U.S. at 285.  That is, this defense to a First Amendment retaliation claim is concerned with what would have happened anyway.  But focusing only on what regulators could have done -- rather than what regulators would have done -- can have the effect of wrongly excusing First Amendment retaliation even where the plaintiff would not have suffered adverse action absent his protected conduct.

Here, the distinction between "could have" and "would have" matters as follows.  The record indicates that regulatory action against McCue would have been just as warranted before Bradstreet took over at the DOA as it was after.  Concerns about McCue's farm were not new.  They were longstanding.  Nor were they

- 28 -

newly serious. The standing concerns about past violations were themselves substantial. Yet the record provides a basis from which a jury could reasonably conclude that the decision to take the adverse action involving the DEP did not occur until May 2006 -- and thus only after Bradstreet came to the DOA and learned of his loss in McCue's USDA appeal.

Bradstreet must thus explain why a reasonable jury would have to conclude that McCue's problematic farming practices alone would have triggered the May 2006 decision to free up the DEP to take action when they had not triggered such action before. But that showing is not an easy one for Bradstreet to make on this record. The DOA possessed enforcement discretion. And the record evidence at least suggests that, until Bradstreet arrived at the DOA, the DOA had a long history of protecting McCue in particular from DEP enforcement notwithstanding the apparent grounds that the DOA had for assuming a more aggressive posture earlier. Thus, in light of the record, Bradstreet has not made the showing that he must to support a grant of summary judgment based on the Mt. Healthy defense. Cf. Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 148-50 (1st Cir. 2013) (denying summary judgment because employer's policies "left room for judgment and discretion" with regard to whether to punish plaintiff employee's actions, and employer had not shown that it "would" have fired employee even if it could).

True, Doak and another DOA official in affidavits state that McCue, in their experience, was the worst offender in Maine when it came to noncompliance with manure regulations. And Crowley, a DEP official, agreed. But there is no indication in the record that these officials came to that judgment only after Bradstreet took office. Thus, even if these statements are credited, it would remain an open question whether the DOA would have turned McCue over to the DEP as it did in May 2006 if McCue had not appealed the subsidy decision. And, as the record permits a reasonable fact-finder to conclude that a pass had been given to McCue up to the time of Bradstreet's arrival, the question would remain as to why things changed so soon after Bradstreet took office -- and, in particular, whether they changed for an impermissibly retaliatory reason when the change occurred in May of 2006.

Thus, drawing all reasonable inferences from the record in McCue's favor, we do not conclude that the record compels a reasonable trier of fact to find that McCue would have been turned over to the DEP for enforcement in May 2006 even absent McCue's protected conduct. The record indicates that such an action by the DOA may have been likely, and that is precisely because of what the record shows about concerns regarding McCue's egregious farming practices. But the record could also be reasonably read to indicate that, in line with historical precedent, no such change

in the DOA's regulatory posture would be forthcoming at that time. It thus "remains plausible that the pre-existing retaliatory motive tipped the scales" when the DOA decided in May 2006 to let the DEP proceed with enforcement actions. Travers, 737 F.3d at 148.

B.

There remain three other adverse regulatory actions about which McCue complains. As to these, the District Court concluded that, unlike the first action just considered, no reasonable trier of fact could conclude that Bradstreet's retaliatory intent was a substantial or motivating factor in any of them. And that is in part because, by then, Bradstreet had recused himself from all future McCue-related matters. Here, we agree with the District Court.

The record shows that on or about May 25 -- when Bradstreet learned that McCue had asked for a meeting with Bradstreet to clear the air -- Bradstreet told his deputy, Ned Porter, that he would be recusing himself from anything related to McCue because of a soured business relationship he had had with McCue in the past.

The timing of the recusal is significant. Unlike the change in DOA policy in May 2006, Bradstreet's recusal on or about May 25 clearly preceded the other three adverse actions: the meeting in late June 2006 at which McCue was told he was under

- 31 -

"strict scrutiny," the DOA's revocation of McCue's provisional Livestock Operations Permit in November and December 2006, and the DOA's denial of McCue's application for the winter-spreading variance in December 2006.

Although McCue does not dispute that Bradstreet told Porter he was recusing himself from McCue-related matters on or about May 25, 2006, McCue contends that the recusal does not insulate Bradstreet from liability for the remaining adverse actions. McCue explains that "[t]he horse (Bradstreet's retaliatory animus) was already out of the barn when the barn door was alleged closed by the recusal." McCue thus argues that Bradstreet's employees at the DOA would predictably have tried to do what they knew the boss wanted, even after the boss's formal recusal. Or, at least, he contends a jury reasonably could so find.

But we do not agree such an inference would be reasonable on this record. We have already concluded that the record would permit a reasonable inference, despite the absence of any direct supporting evidence, that Bradstreet's retaliatory intent played a substantial or motivating role in a change in DOA enforcement policy in May 2006. But the record does not provide similar support for the further inference McCue contends a jury could also make as to the post-recusal actions.

McCue identifies no statement in the record by anyone within the DOA -- or by anyone else -- indicating that McCue had ever suggested to any of his employees that they take action against McCue, let alone that they do so because of what McCue had done to him in appealing the subsidy. Nor, despite McCue's contention to the contrary, does the way in which Bradstreet communicated the recusal require a different conclusion.

As the District Court noted, a reasonable trier of fact certainly could infer that when Porter told McCue at the June 27 meeting that Bradstreet was recused for "hard feelings" that "could not be worked out," other DEP and DOA officials, also present at the meeting, learned about the "hard feelings" reason for Bradstreet's recusal. But that inference is not enough. Evidence that Bradstreet explained to others why he did not want to participate in regulatory decisions about McCue -- presumably for fear that his impartiality in making such decisions might be questioned -- hardly constitutes evidence that Bradstreet wished to communicate to others that they should make decisions about McCue on the basis of the same "hard feelings" that Bradstreet harbored. We thus do not think that a reasonable trier of fact could infer that Bradstreet's means of recusing himself amounted to a subtle but effective signal to staff to go after McCue, or that the DOA officials then acted in conformity with their understanding that their boss wanted them to do so.

McCue cites Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144 (1st Cir. 2013), for the proposition that a trier of fact could infer that DOA employees would try to carry out the retaliatory desires of their boss. In Travers, a CEO had, allegedly, repeatedly told several underlings to "get rid" of an employee because of how much money the employee's lawsuit, the protected conduct in that case, was costing the company. Id. at 145. We concluded that "[a] rational juror could conclude that such strongly held and repeatedly voiced wishes of the king, so to speak, likely became well known to those courtiers who might rid him of a bothersome underling." Id. at 147.

But Travers offers McCue no help. In fact, Travers shows what McCue is missing. Unlike in Travers, McCue has offered no evidence of Bradstreet expressing a desire to go after McCue to any of his staff, much less connecting that desire to protected conduct or expressing those views strongly or repeatedly. Bradstreet's only statement betraying his desire to cause McCue harm occurred in a private setting before Bradstreet had taken office. And the record indicates that the only one within earshot was McCue himself.

Moreover, the record shows that once in office, far from seeming to do all that he could to ensure that McCue would be "bur[ied]," Bradstreet recused himself from matters involving McCue -- albeit potentially only after an initial, unexplained

decision regarding DEP licensing and enforcement had been made. Thus, Bradstreet's reference to past "hard feelings" in carrying out his recusal does not permit the sort of reasonable inference regarding the connection between the boss's retaliatory intent and decisions made by lower-level employees that we permitted in Travers.

Nor is this a case in which it would be reasonable to infer that some illegitimate reason for taking action must have been a trigger for what the DOA did in taking these three post-recusal actions. The explanation for the DOA officials taking the three post-recusal actions against McCue is not hard to fathom. Rather, there was clearly a legitimate predicate for them. McCue had generated great concern about an egregious record of noncompliance with agricultural and environmental regulations. And each adverse action following the early-May change in enforcement policy came further and further in time from McCue's protected conduct. That passage of time further erodes any basis for inferring the retaliation was a substantial or motivating factor in what the DOA did post-recusal.

Thus, any such inference concerning the DOA's post-recusal conduct would necessarily rest on just the kind of unsupported speculation that is not enough to overcome a motion for summary judgment. See Shafmaster, 707 F.3d at 135 (noting that, in reviewing a grant of summary judgement, we "draw[] all

reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation" (internal citations and quotation marks omitted)). We therefore conclude, like the District Court, that no reasonable trier of fact could conclude on this record that Bradstreet's retaliatory intent played a substantial or motivating role in the three, post-recusal adverse actions about which McCue complains.

C.

We close by considering one final argument that McCue makes. He contends that the District Court erred by "compartmentaliz[ing]" its analysis of the four adverse actions, as if they were discrete judgments. In consequence, McCue contends, the District Court mistakenly examined only whether Bradstreet's retaliatory intent substantially caused or motivated each action on its own, such that each was itself taken in violation of the First Amendment. Instead, McCue argues, the District Court should have considered the four actions as an interrelated whole.

More specifically, McCue argues that the decision in early May 2006 to change the DOA's enforcement policy against McCue started a "chain of causation" that led directly to the later adverse actions in June, November, and December such that they, too, could each be deemed an adverse retaliatory action taken in

violation of the First Amendment.  But McCue is less than clear in explaining the nature of that casual chain.

To the extent McCue means to argue that Bradstreet's retaliatory purpose at the outset of his tenure must have been communicated to other DOA officials -- and thus was in that way a substantial or motivating factor in the subsequent, post-recusal regulatory decisions -- McCue is wrong.  As we have just explained, unlike in Travers, the record here simply is devoid of any support for such a speculative inference about what directions to underlings must have been given within the DOA either before or after May 2006.

And to the extent that McCue means to identify some other chain of causation from the first action to the last, he does not spell out what that linkage might be.  For example, he does not identify anything in the record to suggest that any decision by the DOA in May of 2006 to allow the DEP to take enforcement actions against McCue would have sent the signal that was the substantial or motivating factor within the DOA to take the subsequent actions against McCue.

To the extent the record does supply evidence of the basis for the DOA having taken those other actions, moreover, such evidence relates only to McCue's own prior practices on his farm -- and concerns about their egregious nature -- as well as to the pressure to do something about them from other agencies and

concerned citizens. The record thus provides no basis for concluding that DOA officials acted out of a felt need to get in line with a prior decision by the DOA that concerned what the DEP would be permitted to do. Nor does the record contain evidence indicating that the subsequent decisions somehow depended on the first one, such that they, too, would violate McCue's First Amendment rights. Thus, we are left with a record that shows that there was one discrete respect -- and only one -- in which a reasonable jury could find that retaliation was the substantial or motivating factor for an adverse regulatory action by the DOA.

There remains the wholly separate issue of whether any damages flowed from the one adverse action that we conclude a jury reasonably could find had been taken in violation of McCue's First Amendment rights -- namely, the May 2006 decision. It is by no means clear that any damages did follow from this May 2006 decision. McCue did, after all, have a record of generating substantial concerns about his regulatory noncompliance. And the record shows the DOA took a number of subsequent regulatory actions against McCue and that these actions were taken without retaliatory intent being a substantial or motivating factor for them.

But we do not attempt to resolve the damages issue here. The District Court had no occasion to undertake the causal inquiry that would pertain to the determination whether any damages might be attributable to a DOA decision in May 2006 to hand McCue over

- 38 -

to the DEP.  Rather, the District Court concluded -- erroneously, in our view -- that even absent McCue's protected conduct, a jury would be required to find that the DOA would have made the same decision it made in May 2006 regarding DEP enforcement even if McCue had not engaged in protected conduct.  And Bradstreet, for his part, contends only that retaliatory intent was not the substantial or motivating factor for any of the four adverse actions about which McCue complains or, alternatively, that the DOA would have taken all four of those actions even if McCue had never appealed the subsidy.  Bradstreet thus makes no argument that he is entitled to summary judgment on the alternative ground that no harm flowed from the first adverse action McCue purports to identify, even assuming that Bradstreet's retaliation was a substantial or motivating factor in the DOA taking it.  We thus leave it to the parties on remand to contest -- and the District Court to resolve -- whether any damages might be due if a jury were to find that the May 2006 decision regarding the DEP violated the First Amendment, notwithstanding that the record shows that none of the other actions about which McCue complains did.

IV.

We affirm the District Court's conclusion that Bradstreet is entitled to summary judgment with respect to three of the four regulatory actions about which McCue complains in his First Amendment suit.  But we also hold that a reasonable trier of

fact could conclude that Bradstreet's retaliation for McCue's USDA appeal was a substantial or motivating factor in the DOA's alleged decision in May 2006 to allow the DEP to exercise its regulatory power over McCue.  And we further hold that Bradstreet has not shown that a reasonable trier of fact would be compelled to conclude that decision would have been made even if McCue had never appealed the USDA subsidy Bradstreet initially received.  As a result, we **reverse** the District Court's grant of summary judgment in part and **remand** for further proceedings.  We award no costs under Federal Rule of Appellate Procedure 39(a)(4).