# United States Court of Appeals
## For the First Circuit

No. 15-1827

SUSAN K. YOUNG,

Plaintiff, Appellant,

v.

WELLS FARGO BANK, N.A., as Trustee for
Option One Mortgage Loan Trust 2007-CP1,
Asset Backed Certificates, Series 2007-CP1;
HOMEWARD RESIDENTIAL, INC., f/k/a
American Home Mortgage Servicing, Inc.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Barron, Circuit Judges.

Anthony Alva, for appellant.
Marissa I. Delinks, with whom Maura K. McKelvey and Hinshaw
& Culbertson LLP were on brief, for appellees.

July 5, 2016

**TORRUELLA**, **Circuit Judge**.  Plaintiff-appellant Susan K. Young, previously before us after her action was dismissed under Federal Rule of Civil Procedure 12(b)(6), Young v. Wells Fargo Bank, N.A. (Young I), 717 F.3d 224 (1st Cir. 2013), again attempts to avert the foreclosure of her home after seeking a mortgage modification under the Home Affordable Modification Program ("HAMP").  We had vacated the district court's dismissal of her claims for breach of contract, unfair debt collection under Massachusetts General Laws ch. 93A ("Chapter 93A"), and derivative equitable relief.  Id. at 242.  We found that Young adequately pled a breach of contract by alleging that the defendants failed to offer her a mortgage modification in a timely manner, and that she had sufficiently pled damages for her Chapter 93A claim.  On remand, the district court granted summary judgment in favor of defendants-appellees Wells Fargo Bank, N.A. ("Wells Fargo") and Homeward Residential, Inc. ("Homeward")[1] on Young's remaining claims.  She now appeals.  We affirm.

---

[1]  Homeward previously was known as American Home Mortgage Servicing, Inc. in this litigation.

## A. Factual Background

For purposes of summary judgment, we recite the facts in the light most favorable to Young as the nonmoving party. See Collazo v. Nicholson, 535 F.3d 41, 43 (1st Cir. 2008).

Young bought the property where she built her home in Yarmouth Port, Massachusetts, in September of 1997. Nine years later, in September of 2006, she refinanced the property, obtaining an adjustable rate mortgage ("ARM") of $282,000. Wells Fargo is the trustee of the trust that holds her mortgage and Homeward the loan servicer.

Faced with financial difficulties, Young fell behind on her mortgage payments in 2007 and 2008. In August of 2008, she noticed a mortgage payment for $2,600 that she sent Homeward had not been processed. At that time, she also received a notice on her door stating that her mortgage payment was late, but that she could ignore the notice if she had made the payment. Young called Homeward and learned that Homeward refused to process her payment because her account was in foreclosure.

Young asked Homeward how she could avoid foreclosure. After much back and forth, Homeward offered to send Young a forbearance agreement if she submitted an upfront payment of $5,628.42 before September 5. Young did so and, when she did not

receive the promised agreement, called Homeward on September 8. A representative told Young, "there is no agreement." Young then spoke to a supervisor, Maryann Connor, who informed her that, had her check for $2,600 been processed in August of 2008, her account never would have been put into foreclosure. Connor also told Young that Homeward "was handling this situation incorrectly and [was] at fault for not processing the agreement."

Homeward faxed Young a forbearance agreement on September 10, 2008. The agreement provided that "the total sum necessary to bring the Loan current" was $10,738.41 and required, among other things, that Young make monthly payments of $3,144.32 (whereas her mortgage provided for initial monthly payments of $2,030.03). Young worried that she could not afford the increased monthly payments but nevertheless signed the agreement that same day. Young tried to discuss the agreement with Connor but was unable to reach her. Young feared that, if she did not sign the forbearance agreement immediately, Homeward would refuse to work with her.

Young struggled to make payments under the forbearance agreement. Several months after signing the agreement, Young consulted with various lawyers and learned that a mortgage modification may be available through HAMP, a federal program that provides incentives for loan servicers and lenders to give

permanent loan modifications to struggling homeowners.[2] With the help of a paralegal, Jerry DeSalvatore, she applied for a HAMP modification. On October 6, 2009, Homeward sent Young a letter indicating that she was eligible for a mortgage modification through HAMP. The letter indicated that Young needed to comply with a Trial Period Plan ("TPP") to receive a HAMP modification. The TPP required, among other things, that she make three payments of $1,368.94 on or before November 1, 2009, December 1, 2009, and January 1, 2010. According to the TPP, Young would receive a mortgage modification for which her first payment would be due "on the first day of the month following the month in which the last Trial Period Payment is due," or February 1, 2010.

Young sent her December payment on November 30, 2009, and it was received by Homeward on December 2, 2009. She sent her January payment December 30, 2009, and it was received on January 2, 2010. She included a cover letter with her January payment indicating that she "expect[ed] the final modification agreement to be sent . . . by February 1, 2010 without further delay, as per our agreement." On January 13, 2010, Young received a letter indicating that she was "ineligible for a HAMP

---

[2] We advise readers interested in a more thorough overview of HAMP to look to the previous appeal in this case. See Young I, 717 F.3d at 228-29.

-5-

modification" because her payments were untimely under the TPP. The letter stated that Homeward had "not receive[d] all Trial Period Plan payments on or before the 30th day from the due date of the last Trial Period Plan payment." On February 14, 2010, Young received a notification informing her that the interest rate on her mortgage was scheduled to change with her payment due April 1, 2010 (the "ARM Change Notification").

On February 17, 2010, DeSalvatore called Homeward to contest the January letter deeming Young ineligible for a HAMP modification. He spoke with a Homeward representative named Diane, who "admitted that the letter of rejection was a mistake" and explained that "the loan modification should be at [Young's] door within three to four weeks." DeSalvatore sent a follow-up letter to Diane the next day confirming the conversation and explaining that "Young [would] make her February payment in the amount of $1368.94" and expected the loan modification to "arrive in three to four weeks."

On March 9, 2010, Young received another letter from Homeward indicating that Homeward had received a payment for $1,368.96 on January 4 and would place these funds in a suspense account. The accompanying notice provided that "the loan is being reviewed for a loan modification. During the loan modification review process, [Homeward] does not post any payments to the loan

-6-

or assess late charges, to ensure the modification agreement will reflect accurate figures from the loan."

On June 14, 2010, Homeward sent Young a traditional loan modification (not a HAMP modification).  For the modification to take effect, Young was required to submit a down payment of $1,974.43 and make monthly payments of $1,658.71 at an interest rate of 4.625% until June 2013, at which point the monthly payments would rise to $1,718.93 and the interest rate to 5.000%.  Young was required to submit the down payment and executed agreement, along with several requested documents, by June 25.  Young rejected the modification because she considered the terms unacceptable.  She thought the modification was "a significant departure from what the original agreement was" and cited the "very tight deadline" to accept as problematic.  She was disappointed not to have received a mortgage modification through HAMP, which she felt would have had more favorable terms than the modification she received.

## B.  Procedural Background

On January 29, 2011, Young sent a written demand letter under Chapter 93A to Homeward.  In the letter, she explained that Homeward had engaged in unfair and deceptive trade practices through Homeward's conduct surrounding (1) the forbearance agreement, (2) the January 13, 2010 letter advising Young that she

-7-

was no longer eligible for HAMP, and (3) the ARM Change Notification, as well as (4) Homeward's failure to send a HAMP modification by February of 2010.

Young filed suit in Barnstable Superior Court on April 11, 2011, and the defendants subsequently removed the case to the United States District Court for the District of Massachusetts. In her amended complaint, Young asserted two counts for breach of contract, one count for the breach of the covenant of good faith and fair dealing, one count for negligent and/or intentional infliction of emotional distress, one count for unfair debt collection acts and practices under Chapter 93A, and one count for further equitable relief. All of these claims are based in Massachusetts law.

On the defendants' motion, the district court dismissed Young's action in its entirety under Federal Rule of Civil Procedure 12(b)(6). Young appealed, and we vacated and remanded as to one of her contract claims, the Chapter 93A claim, and the claim for further equitable relief. Young I, 717 F.3d at 242. We determined that Young's amended complaint sufficiently alleged that the TPP was a contract that the defendants had breached, and, because "Young's complaint clearly alleges that she performed all of her obligations under the TPP, . . . [t]he TPP's plain terms therefore required Wells Fargo to offer her a permanent

-8-

modification" as of February 1, 2010.  Id. at 234-35.  Likewise, we rejected the defendants' argument that Young failed to allege damages for her Chapter 93A claim, finding that her complaint adequately pled that Homeward's misconduct resulted in the "loss of equity in her home and damage to her credit ratings."  Id. at 241-42.

On remand, the parties proceeded to discovery and the defendants moved for summary judgment.  Following a motion hearing, the district court granted summary judgment on Young's remaining claims in a written order.  Young v. Wells Fargo Bank, N.A. (Young II), 109 F. Supp. 3d 387 (D. Mass. 2015).  Young now appeals that determination.

## II.

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Serra v. Quantum Servicing, Corp., 747 F.3d 37, 40 (1st Cir. 2014).  The grant of summary judgment is subject to de novo review, and we "draw[] all reasonable inferences in favor of the nonmoving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation."  Walsh v. TelTech Sys., Inc., ___ F.3d ___, 2016 WL 1732821, at *3 (1st Cir. May 2, 2016) (quoting McCue v. Bradstreet, 807 F.3d 334, 340 (1st Cir. 2015)).

## A.  Breach of Contract

"Under Massachusetts law, interpretation of a contract is ordinarily a question of law for the court."  Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 9 (1st Cir. 2006) (internal formatting omitted) (quoting Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998)).  To demonstrate a breach of contract, "the plaintiff must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff sustained damages as a result of the breach."  Young I, 717 F.3d at 232 (internal formatting omitted) (quoting Brooks v. AIG SunAmerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007)).

The district court granted summary judgment for the breach of contract claim on the basis that Young's late payments in December and January constituted a material breach of the TPP, and, as a result, the defendants were relieved of their duty to perform under the contract.  Young II, 109 F. Supp. 3d at 392 (citing Teragram Corp., 444 F.3d at 11).  Young focuses on this issue, failing to address what the district court described as an independent basis for dismissing her breach of contract claim, Young's failure to prove damages.  Id. at 393-96.  The district court explained that Young did not show "that the permanent modification offered by Defendants differed in any material way

-10-

from the HAMP modification to which she claims entitlement," nor did she demonstrate any other "mortgage-related delay damages." Id. at 393-94. Turning to consequential damages, the district court determined that Young asserted no evidence of adverse changes to credit, loss of equity in her home, loss of professional reputation, or out-of-pocket expenses for the legal aid she received prior to filing this suit. Id. at 394-96.

Notwithstanding the district court's thorough analysis, Young's opening brief does not so much as mention damages from the alleged breach. "Our precedent is clear: we do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief." Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015). In her reply brief, Young asserts that arguments made in her opening brief as to damages under Chapter 93A apply with equal force to her contract claim. Even assuming Young's cursory argument is sufficient to preserve this point on appeal, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), she fails on the merits.

"The rule of damages in an action for breach of contract is that the plaintiff is entitled in general to damages sufficient in amount to compensate for the loss actually sustained by [her], and to put [her] in as good position financially as [she] would have been if there had been no breach." Pierce v. Clark, 851

-11-

N.E.2d 450, 454 (Mass. App. Ct. 2006) (quoting Boylston Hous. Corp. v. O'Toole, 74 N.E.2d 288, 302 (Mass. 1947)). On appeal, Young does not contend that a modification under HAMP would have been more favorable than the traditional modification she received.[3] Instead, Young asserts that she suffered damages in the form of penalties and fees due to the defendants' handling of this matter and was forced to pay out-of-pocket legal expenses prior to this litigation. But the district court already addressed these points, finding that the defendants "waived all late fees for the period between February and June" and that DeSalvatore offered pro bono assistance. Young II, 109 F. Supp. 3d at 394-95. Young fails to so much as argue why this analysis is amiss, let alone identify evidence to rebut these conclusions.

Our own review of the record reveals that, during her deposition, Young stated that she had paid DeSalvatore but could not recall how much. Normally, a party's testimony, "containing relevant information of which [she] has first-hand knowledge, . . . is . . . competent to support or defeat summary judgment." Cadle Co. v. Hayes, 116 F.3d 957, 961 n.5 (1st Cir. 1997). Even assuming that her pre-suit litigation fees are recoverable as

_____

[3] We have foreclosed any argument that the defendants breached the TPP by offering her a modification that required monthly payments higher than the three trial period payments. See Young I, 717 F.3d at 233.

-12-

damages in a contract action, see Preferred Mut. Ins. Co. v. Gamache, 686 N.E.2d 989, 991 (Mass. 1997) (describing "traditional approach" of "prohibit[ing] recovery of attorney's fees and expenses in a civil case in the absence of either an agreement between the parties, or a statute or rule to the contrary"), we find that Young's vague and conclusory testimony cannot withstand summary judgment. See United States v. $8,440,190.00 in U.S. Currency, 719 F.3d 49, 58-59 (1st Cir. 2013) ("[T]he 'mere existence of a scintilla of evidence' in favor of the nonmoving party is insufficient to defeat summary judgment." (quoting Barreto-Rosa v. Varona-Méndez, 470 F.3d 42, 45 (1st Cir. 2006))). Young never offers so much as an estimate of what she paid DeSalvatore, information that should have been readily available to her. And although the defendants acknowledge that Young paid a $1,000 retainer to an attorney before she began working with DeSalvatore at the start of the modification process, that payment predates the TPP and therefore does not stem from the alleged breach.

Young also argues that the three trial payments due under the TPP constitute damages. However, Young's preexisting mortgage obligation already required that she make monthly payments toward her home. The TPP, which merely lowered her monthly payment amount, did not create a new obligation such that those payments

-13-

give rise to damages.  See Brown v. Bank of Am., Nat'l Ass'n, 67 F. Supp. 3d 508, 517-18 (D. Mass. 2014) (citing Sloan v. Burrows, 258 N.E.2d 303, 305 (Mass. 1970)).

In our previous decision, we warned Young that damages would be critical later in litigation.  Young I, 717 F.3d at 236 n.8.  Young's failure to heed this advice is fatal to her claim, and we therefore affirm the grant of summary judgment as to breach of contract.[4]

## B.  Chapter 93A

As Massachusetts's consumer protection statute, "Chapter 93A provides a cause of action for a plaintiff who 'has been injured' by 'unfair or deceptive acts or practices.'"  Rule v.

---

[4]  Because summary judgment is appropriate on damages alone, we need not reach the question of whether Young's late payments constitute a material breach of the TPP.  The TPP clearly stated, "TIME IS OF THE ESSENCE under this Plan.  This means I must make all payments on or before the days that they are due." Accordingly, the terms of the TPP suggest that Young's payments, even if late by only one day, constituted a material breach of the contract.  See Owen v. Kessler, 778 N.E.2d 953, 956-57 (Mass. App. Ct. 2002) ("Under Massachusetts law, parties will be held to the deadlines they have imposed upon themselves when they agree in writing that time is to be of the essence.").  We note, however, that a HAMP handbook provides that a borrower's payments are "current" where the borrower "made all trial period payments by the last day of the final month of the trial period" for modification effective dates before June 1, 2010.  Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages 127 (2016).  Young did not submit this handbook as record evidence, and we do not determine what weight, if any, it has on the contract here.

-14-

<u>Fort Dodge Animal Health, Inc.</u>, 607 F.3d 250, 253 (1st Cir. 2010) (citation omitted) (quoting Mass. Gen. Laws ch. 93A, §§ 2(a), 9(1)).  "Under Chapter 93A, an act or practice is unfair if it falls 'within at least the penumbra or some common-law, statutory, or other established concept of fairness'; 'is immoral unethical, oppressive, or unscrupulous'; and 'causes substantial injury to consumers.'"  <u>Walsh</u>, 2016 WL 1732821, at *3 (quoting <u>PMP Assocs. v. Globe Newspaper Co.</u>, 321 N.E.2d 915, 917 (Mass. 1975)).

For a plaintiff to bring suit under Chapter 93A, she first must send the defendant "a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered." Mass. Gen. Laws ch. 93A, § 9(3).  "The statutory notice requirement is not merely a procedural nicety, but, rather, 'a prerequisite to suit.'"  <u>Rodi</u> v. <u>S. New Eng. Sch. of Law</u>, 389 F.3d 5, 19 (1st Cir. 2004) (quoting <u>Entrialgo</u> v. <u>Twin City Dodge, Inc.</u>, 333 N.E.2d 202, 204 (Mass. 1975)).  The demand letter requirement puts the defendant on notice of the plaintiff's claim, thereby encouraging negotiation and settlement.  <u>See</u> <u>Spring</u> v. <u>Geriatric Auth. of Holyoke</u>, 475 N.E.2d 727, 736 (Mass. 1985).

Although Young asserts that both defendants violated Chapter 93A, she sent a demand letter to only Homeward.  Young asserts that her demand letter against Homeward is sufficient to

sustain a Chapter 93A claim against Wells Fargo based on legal theories of agency and respondeat superior. Even if we were to accept that an agency relationship may permit a Chapter 93A plaintiff to send a demand letter to only one defendant in a multi-defendant action, Young's demand letter does not mention Wells Fargo, nor does it describe any unfair or deceptive conduct committed by Wells Fargo. Accordingly, the demand letter was insufficient to put Wells Fargo on notice of Young's allegations, and summary judgment is warranted as to the Chapter 93A claim against Wells Fargo. See Passatempo v. McMenimen, 960 N.E.2d 275, 293 (Mass. 2012) (affirming the dismissal of a Chapter 93A claim where the demand letter "did not mention [the defendant's] name and failed to identify or describe any unfair or deceptive act or practice committed by [the defendant]").

As to Homeward, the district court methodically explained why the four acts raised in Young's demand letter did not rise to the level of unfair or deceptive conduct under Chapter 93A. Young II, 109 F. Supp. 3d at 397-401. On appeal, Young does not attack this analysis, instead focusing on Homeward's lack of "any internal mechanism to ensure its customers receive accurate and consistent information" and its failure to respond to her demand letter. We are sympathetic to Young's allegations: the prospect of losing one's home is difficult enough, and Homeward's

inconsistent and confusing communications rendered the process all the more stressful. But her allegations as to Homeward's recordkeeping practices at most sound in negligence, and "a negligent act or acts, alone, do not violate [Chapter 93A]." Klairmont v. Gainsboro Rest., Inc., 987 N.E.2d 1247, 1257 (Mass. 2013); accord Darviris v. Petros, 812 N.E.2d 1188, 1192-93 (Mass. 2004). Rather, "the defendant's conduct must generally be of an egregious, non-negligent nature." Walsh, 2016 WL 1732821, at *3.

Moreover, Young fails to demonstrate economic injury.[5] Although Young argues that Chapter 93A only requires that she show the invasion of a legally protected interest, the Supreme Judicial Court has clarified that "the violation of the legal right that has created the unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself." Tyler v. Michaels Stores, Inc., 984 N.E.2d 737, 745 (Mass. 2013). On appeal, Young asserts that she suffered injury by way of increased fees and interest. But she provides no evidence from which this court can infer that these costs stem

_____

[5] On Young's first appeal, we noted that Chapter 93A typically requires economic injury, but "there may remain certain exceptions to this general rule, embodied in older [Supreme Judicial Court] opinions that have not been overruled." Young I, 717 F.3d at 241. The district court determined that Young was not entitled to non-economic damages under Chapter 93A, a conclusion that Young does not contest on appeal.

from Homeward's alleged misconduct, as opposed to the interest and fees due under her preexisting mortgage.[6]  As a result, she cannot demonstrate a causal relationship between her loss and the alleged deceptive practices.  See Walsh, 2016 WL 1732821, at *3.

Accordingly, the district court did not err in allowing summary judgment as to Young's Chapter 93A claim against Homeward. And, because her breach of contract and Chapter 93A claims fail, her derivative claim for equitable relief must fail as well.

### III.

We affirm the district court's grant of summary judgment as to Young's claims for breach of contract, unfair or deceptive practices under Chapter 93A, and derivative equitable relief.

**Affirmed**.

---

[6]  As in her contract claim, Young asserts that her pre-suit legal expenses qualify as damages under Chapter 93A.  Even if we were to reach this argument, raised for the first time in her reply brief, see Sparkle Hill, Inc., 788 F.3d at 29, we doubt that a Chapter 93A plaintiff can demonstrate injury based on legal expenses alone, especially as Chapter 93A separately provides for "reasonable attorney's fees and costs incurred in connection with said action."  Mass. Gen. Laws ch. 93A, § 9(4).  We are aware of no legal authority to the contrary.